Will the clerk call the next case please. 14-140. With the attorneys presenting arguments today, please step up and introduce yourself and if you could spell your last names for the record, please. Good morning, Your Honors. Assistant State's Attorney Patricia Pantoja, P-A-N-T-O-J-A for the people. I will be addressing arguments one through three. My co-counsel will address argument four. Assistant State's Attorney Noah Montague, M-O-N-T-A-G-U-V. All right, good morning. Good morning. Sharon Nissim from the Appellate Defender's Office on behalf of Mr. White of N-I-S-S-I-N. All right, Ms. Nissim, thank you. Good morning. We will be allotting 15 minutes per side. Ms. Nissim, would you like to reserve a few minutes for rebuttal? Yes, thank you. All right, you can proceed. Good morning. Sharon Goodnissim on behalf of State's White. May it please the Court. Today, Your Honors, I'm going to focus on the arguments made in our supplemental briefing. Although, of course, I'm happy to take questions on any other arguments raised. The arguments in our supplemental briefing address an issue of statutory interpretation that is presently in front of the Illinois Supreme Court. So don't you think your other arguments are much more important because the Supreme Court has this issue in front of them? I think they're having arguments within a week or two, aren't they? Isn't there a mandamus action pending regarding the retroactivity of this statute? Yes, Your Honor, although I believe that the, yes, the mandamus addresses, yes, that it's... Well, you go ahead. Sorry. There's a split already, isn't there? Yes, and I'm happy to address why I believe this Court should not follow some of the other divisions that have already ruled on this issue. But again, I'm happy to address all the arguments in my briefing. When he was only 17 years old, Mr. White received a 26-year sentence, which included the mandatory 20-year add-on for discharging a firearm. The legislature has determined now that in light of Miller and his progeny, juveniles should no longer be subject to those mandatory firearm enhancements. That the state would like him to keep Mr. White in prison for 26 years, even though his case is still pending on direct appeal, and the new law should apply to him. The new law should apply to him because the legislature clearly indicated the temporal reach of this statute by failing to include a savings clause in Section 105. The on or after the effective date language in this section is not a savings clause. We need only look at other parts of the same bill, such as Section 805, to see what language the legislature uses when it wants to make it clear that a new law should only apply prospectively. Section 805 says that the changes made to this section by the Amendatory Act of the 99th General Assembly apply to a minor who has been taken into custody on or after the effective date of this amendment. The language in this section doesn't say that at all. The omission of a savings clause shows that the legislature intended retroactive application of this law. The state doesn't actually try to argue that this language is a savings clause. Instead, they refer to what they call a delayed effective date. But there is no such thing as a delayed effective date. The date that this Act became effective was the default date for all statutes passed in 2015, January 1, 2016. The state has to actually show that this section is explicitly prospective. If you do not agree with our argument that this omission of a savings clause shows that the legislature intended retroactive application, then what we're looking at here is a legislature's silence on the temporal reach of this statute. In that case, we must look to Section 4 of the Statute on Statutes. Kaveny v. Bauer was extremely clear in the Illinois Supreme Court decision that if the statute is silent on temporal reach, the legislature is presumed to have enacted the law with Section 4 in mind, and that amendments that are procedural in nature, such as these, may apply retroactively. May meaning a defendant can choose whether to apply the new or old law if he or she is resentenced. Your Honors, we believe that Hunter and Wilson, those are the decisions you referenced, were wrongly decided for several reasons. One is that the Wilson court, both Hunter and Wilson, I should say, wrongly interpreted that honor effective date language as an explicit grant of prospectivity. Somehow that showed the legislature clearly wanted this to be prospective. As I said, we don't agree with that. But if, Your Honors, you were to find that, then I would also argue that the Hunter and Wilson court did not look closely enough at the language of this statute. The honor effective date language is only in subsection A. So there's three subsections in Section 105, A, B, and C. A applies to talks about mitigating factors in light of Miller that courts must not consider when sentencing any juvenile. Sections B and D is the prohibition on mandatory firearm enhancements for juveniles. That's at issue today. And Section C is the prohibition on natural life for juveniles. If the legislature had wanted that language to apply to all three subsections, they could have put it in the beginning, they could have put it at the end, like they do in several other sections, they could have put it in all three subsections. But it's only in subsection A. And Your Honors, this makes sense from a policy perspective. Subsection A applies to every single juvenile offender, and if applied retroactively, would necessitate thousands of re-hearings, while subsections B and C only apply to the smaller subset that received the harshest penalties and are the most in need of retroactive relief. The Wilson court didn't look carefully at the language. First, they treated that language like a savings clause, which it isn't. Then they created one super clause with no distinction between subsections A, B, and C, just not honoring the intent of the legislature. The Hunter court did several things that we believe misunderstood various laws. First of all, the Hunter court went to step two of the Landgraf test. It's very clear in Kaveny v. Baumgart. Didn't they not go to the second? Well, I believe the Hunter court discussed whether the law could apply retroactively in the sense that the second part of the Landgraf doesn't have a retroactive impact, which, again, is confusing because we use the same word, and whether it impacted vested rights or it was disruptive or impracticable. That's no longer the test. In fact, I believe that Kaveny clearly said that it was inconceivable that a court would ever look to the second step of Landgraf anymore because what Kaveny did was create uniformity here where we're presumed to always know the legislative intent, either in the statute itself or the legislature is presumed to have acted with knowledge of Section 4 of the statute on statutes in mind. And then the question is, is it procedural or is it substantive? So I do believe the Hunter court misunderstood, didn't apply Kaveny properly. Secondly, the Hunter court misunderstood the may in the statute on statutes, making an argument that where the statute on statutes says amendments of our procedural nature may apply retroactively, that it's up to the court to then determine if it should or it shouldn't. That doesn't make sense for several reasons. First of all, Kaveny was seeking uniformity. If procedural amendments only sometimes apply retroactively, that would mean substantive ones may be applied retroactively as well, which we know isn't the case, and it certainly wouldn't create uniformity. Second of all, that may, as I said before, addresses whether a defendant can choose to apply, which law defendant usually chooses to apply. Normally procedural changes hurt defendants, and there aren't particularly many examples of this type of change. The procedural changes usually hurt defendants? A lot of times there are. An example where defendants wanted to apply retroactively would be Apprendi. And actually in Peeble v. Wagner and Peeble v. Ford, the court held that Apprendi would apply to cases on direct appeal. So that's a good example here. Although a lot of the time when the legislature makes changes, it's not something necessarily that a defendant would want to use the new law. Can I ask you about one of your other arguments? Yes. Your reasonable doubt argument. You poke a lot of holes in Mr. Robinson's testimony, and then there's a witness for the defense, obviously. Why is this anything different than a sort of garden-variety battle of credibility between two witnesses and the jury picked one? Why is this case different and rise to the level of reasonable doubt? I'm sure, Your Honor, for several reasons. First of all, this is not just a garden-variety. There are reasons, too, that Mr. Robinson's testimony is not only unreliable  I'll just go through those quickly. Mr. Robinson, I won't go through all the bigger factors that are in the brief, but Mr. Robinson didn't have much of a chance to see what was going on. But more importantly, his testimony was impeached on certain points. At his grand jury testimony, I believe, or previous hearing, he had stated that he was outside the house with, I believe it was Ja'kia Lewis. And then at trial, he first said no, there was no Ja'kia Lewis outside, and then he said, you know, actually there was a Shakitha Lewis, which caused him to question his whole memory and ability to know what was going on while he was under the stress of being shot at. And then from a few houses away, he saw somebody that he recognized. Maybe he hadn't seen him for a few years, but I think he went to grade school with him, elementary school. And he also identified the Band-Aid, right? I mean, to me, that's the State's best case, right? Yes, Your Honor. Yes, he was under stress. Yes, he may not have looked at him for a long time. But it was recognized before that if you actually recognize the person as someone you know, the opportunity to view is, we look at things a little differently. The length of time you had to view him, if it's someone you know versus someone you're just trying to make out. I would argue that this Court should not be looking at any cases of, you know, what do we do when he knows the person? I believe the record is actually clear that he did not know what the 17-year-old looks like. When he was cross-examined, Mr. Robinson admitted that he had not seen the defendant in any year prior, in the last 10 years. I believe the counsel actually went through each year and said, did you see him in 2012, 2011? No, no, no, no, no. Going back 10 years, he couldn't remember when he'd last seen him. It's possible that he last saw him in elementary school, but people don't really look the same when they're 7 years old versus 17 years old. So, counsel, I would submit that he did not know him in the sense of, of course, there is that case law that, you know, if you recognize someone, you know, that sort of trumps everything. He gave that name to the police, contemporaneously, did he not? You know, there was actually no police testimony in this case, which was one of the sort of strange, strange things about this case. You didn't argue that, did you? You argued that there were a lot of things stated that were not supported by the evidence. But I don't think you argued that he ever said it was T.J. or even a police officer. I really mentioned in the brief that there was no corroborating testimony from any police officers. There was a police officer who testified that he got a report that it was Mr. White and he knew him from being a security guard to school. It's not clear exactly when Mr. Robinson told police or his father that he saw someone with a band-aid or that it was Mr. White. The timeline is not clear, and I think, I believe you did point out in the brief that there was no testimony from whoever's police officer spoke to Mr. Robinson. So it is actually relatively ambiguous as to, again, when he came up with this, oh, the guy had a band-aid on his face. It's interesting that he could see that he had a band-aid on his face when he couldn't really describe anything else about him, his build, his height, nothing like that. Well, did he say he couldn't, or was he really ever asked that? I believe there's testimony that he was only able to describe very little about his physical appearance as opposed to the defense witness who was able to, Jasmine Stokes, who was able to definitively say, I know Mr. White, and it wasn't him. And as far as we know, she's a completely disinterested witness. There was no evidence as to why, any reason that she wouldn't be telling the truth. She was able to give more description of his physical features, which actually matched Ashanti's, what Ashanti looks like. He was the other person involved in that fight earlier today that was supposed to give some sort of motive for this shooting. And her testimony went entirely unimpeached, Your Honors. In addition, I believe that our argument about prosecutorial misconduct kind of goes part and parcel with this reasonable doubt argument. Given the close nature of this case, where the state's entire case rested on this unreliable witness account, prosecutorial misconduct such as what occurred here should be scrutinized very closely by the courts. In opening arguments, the state promised several witnesses who would identify Mr. White as the shooter. Not just, oh, there are going to be a bunch of witnesses for the state. Specifically, that they would identify Mr. White as the shooter. But they didn't deliver more than Mr. Robinson. This is a serious problem. The state now tries to say that this was done in good faith and so it doesn't matter. But the record actually shows the prosecutor knew he wouldn't be using at least one of these possible witnesses, I believe it's Christian Noble, before trial as an order of sending him back. Why didn't you put that in your brief? I believe that's in our reply. It is? Yes. Because I know the records don't indicate that. Yes, that is definitely in our reply because I remember the order said that he's no longer needed as a witness. This is clear misconduct, leaving the jury with the impression at the beginning of the trial that the state and all the power that it has has more witnesses identifying Mr. White that for one reason or another is not going to be able to put on the stand but that they exist and they're somewhere out there. In addition, in rebuttal closing argument, the state told the jury that Mr. Robinson had no criminal background. There's nothing in the record about that. The prosecutor was testifying to the jury telling them that Mr. Robinson had no criminal background and this was not, as the state says, in response to some argument that defense counsel made. Defense counsel did mention Robinson's credibility but nothing about his criminal background. This was clearly a close case. The jury wanted to know and asked the court why Ashanti and Dequan were not called as witnesses. They had doubts about Mr. White's innocence. They were struggling with the decision and this type of misconduct could have certainly 'll see why we have two cases with lips with her on the top of the report,   testimony and named identification of the defendant as the shooter. In this case, your honors, contrary to defense counsel's argument, the defendant, excuse me, the victim, James Robinson, had ample opportunity to view the defendant. He testified during trial that he heard shots, he ducked, he turned to look away, and he was actually going to run in the direction of the defendant, but saw him standing there with a gun pointed at him. And then he turned around and left and ran in the opposite direction. Your honors, the victim also testified that he knew the defendant. Contrary to what counsel argued, the defendant testified that he had known the defendant for 10 years. And although he had not seen him possibly for several years, that doesn't mean that the victim didn't know the defendant anymore. He still knew him. Arguably, this is somebody that he went to grammar school with, he's known him for such a long time, that although maybe he hadn't seen him for several years, certainly the imprint of who this person is is in his mind. He could readily identify him and recognize him as somebody he knew. The testimony during trial, your honors, was defense counsel during trial on cross-examination asked the victim when the last time he had seen him. Initially, he went back to 2006, and the victim said, I haven't seen him since 2006. Later, the victim testified, I'm not really sure exactly when I saw him. But even at that point, that's five years. No, your honors, it's not. We have here, again, the victim knew who the defendant was. The victim identified the defendant immediately. That same day, he told the police that it was T.J., the person he knew was T.J. Wait a minute here. Closely balanced, to me, is a case where there's no physical evidence. There was nothing here, no physical evidence. You don't have any statements that the defendant admitted. You have the eyewitness who's cross-examined extensively. Says, you know, I knew him from grade school, but really I haven't seen him for years. But then you have another witness that the defense presents, a young woman who went to high school with these young people. She said she knew both of them. She wasn't really friendly with either of them, but they all went to high school together. And she testifies that the person that did the shooting was definitely not the defendant. And she described physical characteristics that she recalled, which seemed to fit this other kid that was on the bus and later had the fight with the defendant's brother. And then you have the defendant saying that he didn't shoot at the victim. So you're saying that this is not closely balanced? Yes, Your Honors. What case would you cite that would say that when there's a credibility question, there's an independent witness who really wasn't impeached about, you know, was she really friendly with the defendant or not, and there's no physical evidence of any kind, no statement, what case says that this particular set of facts is not closely balanced? Your Honors, there's a plethora of cases that indicate that a single eyewitness is sufficient to sustain a conviction. Sure, and I agree with you on that. But in this case, it was more than just the testimony of the victim, James Robinson. James Robinson on the day of the shooting told the police that the defendant, the shooter, had a bandage underneath his eye. Two days later, when the defendant was arrested, he had that bandage underneath his eye. The victim's testimony at trial was corroborated by the fact that two days later, this defendant had the bandage. And again, the bandage, the victim told the police and his father the same day of the shooting that he described him as wearing something dark and that he had a bandage underneath his eye. But that's it, right? I mean, that's the case. And on the other side, the defense has somebody who says, I know this guy, too, and I saw the shooter, and that shooter was not that guy. That's correct, Your Honor. That's not closely balanced? Your Honor, it's the promise of this Court to determine whether the evidence was so unsatisfactory, improbable. Well, I wasn't talking about reasonable doubt. Yes, Your Honor. I was talking about whether the evidence was closely balanced because there's a number of errors alleged. Sure. Your Honor, we would argue it's not closely balanced. Again, there's lots of cases that indicate this was enough. And here the jury made a determination that they found the victim in this case more credible. What about the comments that were made? Is it proper for someone to say that he doesn't have any criminal convictions? Because if he did, you'd hear about him? Your Honor, had the defendant objected or defense counsel objected to that statement, it would have been properly sustained. However, there was no objection that all of the arguments in defendant's second issue are forfeited. There was no objection made at trial. That's the backdrop for this possibly, the first fraud complaint error. Yes, there was no objection made at trial. Well, there wasn't any objection to the opening statements either, was there, that there would be witnesses that would identify the defendant? That's correct, Your Honor. And to that point, Your Honors, contrary to what counsel argued, there was an order from the court dated in July of 2013 that Christian Noble was no longer needed. However, during voir dire at the beginning of trial, the name of this witness was presented to the jury as a possible witness when the jurors were asked if they knew any of these possible civilian witnesses. Sure, but did the state, was the state a participant in the order that said he's no longer needed? No, Your Honor. It was an order from the court. There was not something that the people prepared or presented or signed in any way. Well, what was he doing there? I don't know. I don't know. I don't know. I don't know. Unfortunately, the record is silent as to that. Your Honor, the statement was, if you believe that the victim testified that he saw this defendant and identified him as a shooter, then you must convict the defendant. The prosecutor was merely explaining to the jurors that it was for their determination to make the credibility determination, and based on, and that it hinged on that, and that that was going to determine what their verdict would be. But that's not always an issue of credibility. They could believe this witness is testifying earnestly, but could be mistaken. That's correct, Your Honor. But when you say you don't believe him, he's either lying or he's guilty, you present something that's troublesome. The prosecutor was indicating that the witness had no reason or the victim had no reason to lie. But he could also identify the defendant without lying, is the point I'm getting. He could be mistaken, and therefore you present an alternative to believing this witness, which is unfair to the defendant. Yes. Yes, Your Honor. That would be, if that were the case, yes, that would be certainly. The State's not allowed to argue that their burden is just to show who's telling the truth. That's correct, Your Honor. And the last thing they heard was nothing about the burden of proof proving the elements of the offense. Rather, it was simply a credibility contest. It was that easy. And the prosecutor was attempting to explain that it was for their determination as to who to believe and that their conviction would then hinge on that credibility determination. Is it your recollection of the record that the first time the word lying came up was in the rebuttal? Did the defense attorney ever utter the words that someone was lying? No, Your Honor, I don't believe so. But in this case, Your Honor, even if there was, even if that statement were improper, which, again, our position is that it's not, it simply does not rise to the level of clear and obvious error, or it's not clear and obvious error that would rise to plain error that would warrant reversal. Well, if the burden of proof is misstated, that's not a clear and obvious error? Yes, Your Honor, this is not certainly, our position is this is not misstating the burden of proof. And what about when the prosecutor said that the complainant had no prior criminal background? Is that a plain and obvious error? No, Your Honor, it's still not. Where is there evidence that would support a statement such as that? There is nothing in the record, Your Honor, that came out at trial about the defendant's lack of criminal history. All right. Is the prosecutor ever allowed to make a statement in an argument that isn't based on the evidence presented? No, Your Honor, they are not. Why isn't that a clear and obvious error? Because it simply doesn't rise to the level of plain error. I'm not talking about plain error now. I'm talking about the first part of that equation, which is whether or not something is a plain and obvious error. Is it a plain and obvious error for a prosecutor to basically testify during his closing? Your Honor, that statement was improper. But not plain and obvious? Yes. All right. Okay. I think we've probably gone a little beyond here. Okay. Did your co-counsel want to speak to us, address us? Yes, Your Honor. We're going to need to keep it brief, if that's all right. Yes, Your Honor. Your Honors, Assistant State's Attorney Noramonti, on behalf of the people here, you had asked before about whether this issue was going to the Supreme Court in a maintenance. That is actually argued next Thursday. And actually, I will be arguing that. Well, tell us what you're going to tell the Supreme Court. Unfortunately for me at this point, that case is involving Section 5-130, which is the automatic exclusive jurisdiction provision, which is not an issue here. This is obviously about a sentencing provision. As far as this case goes, the people would actually just rest on their brief and field any questions you might have. Isn't that portion of the statute, though, that directs the court to consider sentencing factors, isn't that part of the same statute? That's 5-4.5-105 is the sentencing statute that is at issue here. That was actually passed in two different public acts, 99-69 and 99-258. There are three big public acts that affect the Juvenile Court Act and the various criminal acts. Is there a different language that you're basically telling us would change the reasoning or the rationale as to whether or not they apply to this defendant? Well, the sentencing statute has the on or after language, which two other panels of this first district have examined and found to indicate prospectivity. The one that's going to the Supreme Court is actually just two subsections crossed out by lines and a 16 written in next to a 15, nothing else. But the counsel for the defendant has argued that the sentencing provisions are retroactive. She has, and obviously the state doesn't agree. And our position, of course, is that the plain language of the statute as found in Hunter and Wilson clearly indicates prospective application, prospective intent on behalf of the legislature. Because it says on or after at the very beginning. That's correct. The operation of that entire statute is predicated on the coming of this delayed effective date. And by putting that language in there, under Brown and Genesee v. Pappas and other cases, the legislature clearly expressed an intent for prospectivity. And so if there are no other questions, the state would rest on their feet on this issue. Thank you. Thank you, Mr. Monaghan. Ms. Nissel, a few minutes for rebuttal. Just briefly, Your Honor, as to the retroactivity argument, yes, I should have said that the pending mandamus petition addresses Section 130 as opposed to Section 105, which is one of the reasons I did address it today. Your Honor, there's the plain language in this case, you know, as I've argued, the plain language in Section 105 does not indicate prospective intent. The language on or after. The language on or after. Yes, Your Honor. That language is not the same as language that has been held to be a savings clause in both in the same bill, Section 805, in People v. Grant and People v. Richardson, where courts have found plain language showing prospective intent. That is very different language than what we have here. But even if Your Honors do find that it shows prospective intent, again, I would argue that it's only as relates to Subsection A, which makes sense. These are the mitigating factors to be considered for all juvenile sentencing going forward. It would not make sense from a policy perspective to apply that retroactively. B and C are very different. And again, the legislature, they're not stupid. There's no reason to put it only in Subsection A if they intended it to apply to the entire section. As to the other arguments discussed today, I would really say as for the prosecutorial misconduct arguments, these were severe errors. The opening statement promising witnesses that the state didn't deliver, shifting the burden of proof in rebuttal closing, and testifying, the prosecutor testifying to the jury. This is a classic case of closely balanced here. This clearly should be found to be plain error. It's closely balanced because there's no physical evidence. The one witness, Mr. Robinson, was clearly impeached, and we have another witness who was not impeached. And it's not at all clear that Mr. Robinson had actually seen the defendant any time in the last 10 years. Your Honors, we would ask under Arguments 1 through 3 that he, Mr. White, be granted a new trial. And as to the supplemental arguments, that he be given a chance to be resentenced under the new law. Thank you very much. Thank you, Counsel. Thank you both. The case was very well briefed and very well argued, and we will take it under advisement.